370 So.2d 842 (1979)
Robin M. FORSHEE, Appellant,
v.
PENINSULAR LIFE INSURANCE COMPANY, Appellee.
No. 78-1631.
District Court of Appeal of Florida, Third District.
May 8, 1979.
*843 Chambers & Hayes and Charles A. Hayes, Homestead, for appellant.
Mahoney, Hadlow & Adams and William C. Crenshaw, Miami, for appellee.
Before PEARSON and KEHOE, JJ., and EZELL, BOYCE F., Jr. (Ret.), Associate Judge.
PEARSON, Judge.
The appellant, Robin Forshee, sued the appellee, Peninsular Life Insurance Company, claiming the right to payments for accidental death benefits as the beneficiary under a policy issued to her husband, Richard G. Forshee. She received a jury verdict, but judgment was entered for the defendant insurer in accordance with its motion for a directed verdict. The parties agree that the basis for the directed verdict was a holding by the trial court either that the evidence showed without issue of fact that the deceased was committing or attempting to commit an assault or felony at the time he was shot,[1] or that the plaintiff did not meet her burden of showing accidental death. We hold that there was a jury issue presented on each of these grounds and we reverse with directions to enter judgment upon the jury verdict.
The evidence presented to the jury was that plaintiff Robin M. Forshee is the widow of Richard G. Forshee, who was shot to death on October 14, 1975. She was the only live witness; Carl E. Reddick, the person who shot Richard G. Forshee, testified by deposition. The exhibits placed into evidence consisted of the death certificate and the Peninsular Life Insurance Company policy.
The plaintiff testified that she had been married to Richard G. Forshee since February 3, 1971, and that he had been employed as a body and fender man. She last saw her husband alive at about 10:30 p.m. on October 14, 1975, at the family home, when he had left to go to the home of Jerry Reddick (the nephew of Carl Reddick, who shot the decedent) to see whether he could get some money that he had lent Jerry. Shortly thereafter, the plaintiff was notified that her husband had been shot. There was no gun with his personal belongings; neither did he own a gun nor had the plaintiff ever seen him with a gun.
The plaintiff also testified that when the decedent left home that evening, he was not intoxicated or upset and did not have a gun. She had never seen her husband fight with anyone or argue with anyone, except her. She had never seen him threaten anyone and she described him as a happy person who joked with Jerry, both of whom were in the paint and body shop business.
The death certificate revealed that the decedent died at 12:01 a.m. as the result of "[g]unshot wounds of [the] body."
*844 The defendant insurer then offered the deposition testimony of Carl Reddick, the person who had shot the decedent. He testified that he was lying in his nephew's automobile in the nephew's backyard when he heard another vehicle pull in. He heard the decedent and Jack Gersonder, who had gotten out of the truck, talking. He testified that while lying in the automobile, he heard the decedent say, "Well, make sure we can get out of here in a hurry because I'm going to waste this dude." He also saw something in the back of their Levis which he thought were guns. He saw the decedent and Gersonder enter the house and heard his nephew, Jerry, and the decedent arguing and saw the decedent push Jerry against a wall. He also saw Gersonder with a gun in his hand. He then saw the decedent hit the wall beside Jerry. He testified that the conversation was over a money matter between Jerry and the decedent. He further testified that at this same time he was himself outside for what "must have been ... seven minutes" looking around for "something to start a war with" and "trying to figure out [what] to do." He then remembered Jerry had a pistol in a drawer in the far bedroom of the house and he thought that he could scare off the decedent and Gersonder with the pistol. He went around to the bedroom window and was there about ten minutes before taking the window out. Billy Reddick (a nephew of Carl) was asleep on the couch and Carl knew that he could not wake him up. He attracted the attention of Brenda Reddick, Jerry's wife, who handed him the pistol out the window. He then went back around the house to the outside kitchen steps where he remained throughout the entire incident.
The two men were arguing in a "two-by-four" kitchen and the decedent was turning around and drinking beer and threatening. Carl then aimed the pistol at the men in the kitchen and said, "Let's go. Get out of there, both of you." Gersonder put his hands up and the decedent allegedly said, "Hey, I'll just kill you too" and walked toward Carl. When the decedent made the comment, "I'll kill you too," Carl shot the decedent in the shoulder while the decedent was allegedly reaching behind his back. The decedent had taken two steps toward the kitchen door when shot. He was inside the kitchen and blood was found in the kitchen. The decedent, who was then walking fast toward the door, was shot a second time in the leg, and then was shot two more times, and thereupon dropped at the back steps. Carl said he first saw a gun sticking out of the decedent's Levis when he fell and at no time did he touch the gun.
Carl then shot Gersonder, who, though wounded, took the decedent to James Archer Smith Hospital.
Carl fled and hid in a banana grove where he overheard the police making their investigation. He heard his nephew, Billy Reddick, tell the police that he did not know the person who had done the shooting. Carl then fled to another home in Homestead and later called the police to report that he had shot the decedent. Jerry Reddick, who had been arguing with the decedent, took the gun used in the killing and fled the scene with his entire family.
The deposition testimony of Carl Reddick reflected that the decedent never drew a gun, that Carl himself had done all the shooting, that the decedent had struck no one that evening and that the incident involved a heated argument between two men who had been friends and had worked in the body shop business in Homestead.
When questioned on the subject of sobriety, Carl testified that he had consumed about two or three beers starting about four or five o'clock that afternoon. He also thought the decedent had a can of beer with him when he entered the house.
A directed verdict for a defendant at the conclusion of the presentation of evidence or after jury verdict is proper only when the evidence viewed in the light most favorable to the plaintiff shows that the jury could not reasonably differ on the existence of a material fact, and the defendant is entitled to a judgment as a matter of law. See McCabe v. Watson, 225 So.2d 346 (Fla. 3d DCA 1969); see also Hendricks v. Dailey, 208 So.2d 101 (Fla. 1968).
*845 The question of whether a death is accidental or whether the decedent was the aggressor or committing an assault at the time of his death is, by its very nature, a question of fact. Republic National Life Insurance Company v. Valdes, 348 So.2d 566 (Fla. 3d DCA 1977). See also Mutual Life Ins. Co. of New York v. Bell, 147 Fla. 734, 3 So.2d 487 (1941); and Walker v. Prudential Ins. Co. of America, 127 F.2d 938 (5th Cir.1942).
The jury is the sole trier of the facts and may draw any reasonable inference from the evidence submitted. See National Airlines v. Florida Equipment Co. of Miami, 71 So.2d 741, 744 (Fla. 1954).[2]
The defendant's argument that because no person other than the one who shot the decedent testified about the shooting, the jury must accept the witness's conclusion that the decedent was engaged in an assault, is not maintainable. The jury could have found that the decedent did not have a gun, was peaceful in his intentions, and was shot because Carl Reddick misinterpreted the decedent's actions or was shot for other reasons. We, therefore, hold that the evidence before the jury did not show that the defendant insurer was entitled to a judgment as a matter of law on the basis that the evidence established without issue that the decedent was engaged in the commission of an assault at the time he was shot. Cf. Mutual Life Ins. Co. of New York v. Bell, 147 Fla. 734, 3 So.2d 487, 488 (1941).
The defendant's claim that the evidence did not prove a prima facie case of accidental death is also without basis on this record.[3]
Reversed with directions to enter judgment on the jury verdict.
NOTES
[1] A limitation under the policy concerned "(g) Participating in or attempting to commit an assault or felony."
[2] * * * * *
"It not infrequently happens that there is actually no conflict in evidence as to what was done or said, but the inferences of ultimate fact to be drawn from these evidentiary facts may be quite different. It is peculiarly within the province of the jury to draw these inferences and determine the ultimate facts. The constitutional guaranty of the right of trial by jury is respected only when this rule is strictly applied."
[3] The policy provided the following definition of "accidental death":

"Accidental death means loss of life resulting independently of all other causes from bodily injury and evidenced by a visible contusion or wound on the exterior of the body . .; and death occurred within 90 days after such injury and such injury effected while the Policy was in full force on a premium paying basis."